UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

SABRINA DARBY                          CIVIL ACTION NO. 6:19-cv-01073

VERSUS                                 JUDGE SUMMERHAYS

U.S. COMMISSIONER,                     MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's finding of nondisability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action.

## Administrative Proceedings

The claimant, Sabrina Darby, fully exhausted her administrative remedies before initiating this action. After the Social Security benefits she received as a child were terminated, Ms. Darby filed an application for child's insurance benefits based on disability and an application for supplemental security income benefits ("SSI"), alleging disability beginning on March 1, 2010.[1] Her applications were denied.[2] She

---

[1]    Rec. Doc. 8-1 at 168.

[2]    Rec. Doc. 8-1 at 82, 83.

then requested a hearing, which was held on November 1, 2018 before Administrative Law Judge Christine Hilleren.[3]  At the hearing, the alleged disability onset date was changed to December 20, 2015.[4]  The ALJ issued a decision on November 23, 2018, concluding that Ms. Darby was not disabled within the meaning of the Social Security Act through the date of the decision.[5]  Ms. Darby requested that the Appeals Council review the ALJ's decision, but the Appeals Council found no basis for review.[6]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review.[7]  Ms. Darby then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

Ms. Darby was born on March 4, 1997.[8]  At the time of the ALJ's decision, she was twenty-one years old.  She completed the eighth grade,[9] and has no work experience.[10]

---

[3]    A transcript of the hearing is found in the record at Rec. Doc. 8-1 at 31-59.

[4]    Rec. Doc. 8-1 at 35.

[5]    Rec. Doc. 8-1 at 24.

[6]    Rec. Doc. 8-1 at 4.

[7]    *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[8]    Rec. Doc. 8-1 at 36.

[9]    Rec. Doc. 8-1 at 36, 168.

[10]    Rec. Doc. 8-1 at 38, 338.

In support of her new application for benefits, she alleged that she has been disabled since December 20, 2015 due to a variety of mental impairments including attention deficit hyperactivity disorder ("ADHD"), bipolarism, schizophrenia, and a learning disability.[11]

Ms. Darby underwent a psychiatric evaluation by D.A. Schexnayder, M.D. Ph.D. at Magnolia Family Services in Thibodaux, Louisiana on March 30, 2011.[12] At that time, she was fourteen years old. She reported that she had been living with her mother's niece since June 2010. Before that, she had reportedly lived with her aunt and her aunt's boyfriend and the boyfriend had allegedly molested her from age eight until January 2010 (when she was almost thirteen). Her aunt died in May 2010. The claimant reported that she had been hospitalized at Children's Hospital due to thinking of suicide by overdose and thinking of killing her mother and her aunt. Her mother, who she claimed had a substance abuse problem, had allegedly prostituted her. Another aunt had allegedly spread false rumors about her. She reported that she contracted herpes at age eight. Her father allegedly was a violent alcoholic. She reported problems at school, problems making friends, pulling out her hair, checking and rechecking doors and locks, worrying, and intrusive thoughts. She had taken Vyvanse and Risperdal with little improvement, but Lexapro had helped with hair

---

[11]     Rec. Doc. 8-1 at 60.

[12]     Rec. Doc. 8-1 at 235-237.

pulling and social anxiety. Dr. Schexnayder's impressions were social anxiety, separation anxiety, obsessive compulsive disorder ("OCD"), depressive disorder, and possible reading or math disabilities. He discontinued the claimant's Risperdal and Vyvanse prescriptions, and increased the Lexapro dosage. He assigned a GAF score of 40.[13]

In 2015, Ms. Darby was seen at the emergency room of Iberia Medical Center in New Iberia, Louisiana six times for medical problems unrelated to her mental health issues.[14]

On August 4, 2015, Ms. Darby was seen by psychiatric nurse practitioner Cynthia Labiche at Iberia Comprehensive Community Health Center in New Iberia, Louisiana.[15] She reported a history of depression, cutting, frequent mood swings, and inpatient psychiatric treatment. She was easily agitated and had to be "redirected" several times because she was cursing in the center's lobby. She

---

[13]     The GAF scale is used to rate an individual's "overall psychological functioning." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") 32 (4th ed. 1994). The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status. A GAF score in the 31 to 40 range indicates "[s]ome impairment in reality testing or communication. . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. . . ." The GAF scale was omitted from DSM–5 because of its "conceptual lack of clarity. . . and questionable psychometrics in routine practice." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–5") 16 (5th ed. 2013).

[14]     Rec. Doc. 8-1 at 269-284.

[15]     Rec. Doc. 8-1 at 322-324.

4

complained of trouble with being off task and hyper. She denied alcohol and drug abuse. She reported having taken a variety of medications for her mental problems but stated that she had been off her medication for about three months. She was living with her stepmother, grandfather, and three siblings. She was prescribed Seroquel and Prozac and was to follow up in a month, but the record contains no evidence of the recommended follow-up visit.

On December 14, 2015,[16] Ms. Darby was seen in the emergency room at Iberia Medical Center after attempting suicide. She reported hearing voices, and it was noted that she was depressed, had cut herself, and felt very alone. She reportedly smoked cigarettes and marijuana and had a family history of mental illness. The clinical impressions were depression, suicide attempt, suicidal ideation, urinary tract infection, and bipolar condition.

Later that day, Ms. Darby was admitted to Apollo Behavioral Health Hospital, LLC in Baton Rouge, Louisiana on a physician's emergency certificate ("PEC"). She received inpatient psychiatric care until her discharge a week later, on December 22, 2015.[17] The records from this hospitalization indicate that she had made several superficial cuts on both arms following a confrontation with family members. She also reported homicidal ideation including a plan to shoot family members. Upon

---

[16]    Rec. Doc. 8-1 at 285-290.

[17]    Rec. Doc. 8-1 at 242-258.

admission, she was alert, attentive, and casually dressed. She had appropriate facial expressions, normal psychomotor activity, and a cooperative attitude. Her rate of speech was increased, and the quality of her speech was pressured. Her thought process was circumstantial (providing a lot of unnecessary details), and she reported auditory hallucinations. She was very sad and very nervous. She reported insomnia and anger problems, indicated that there was psychiatric illness on both sides of her family, and reported that her mother and other family members were chemically dependent. Her mood was labile, depressed, worried, anxious, and expansive. Her thought process was logical, normally goal oriented, coherent, and unimpaired. She denied any obsessions or over-valued ideas. She was oriented, and her memory was intact. Her fund of knowledge was average. She had transient impairment to her judgment with partial insight. She gave a history of five to seven prior psychiatric hospitalizations. The admitting diagnosis was Bipolar Disorder, Type I with a history of Attention Deficit Hyperactivity Disorder. It was noted that she was an episodic drug abuser. Her GAF score was 35.[18] Her prognosis was guarded to poor. The preliminary treatment plan was to control and stabilize her acute symptoms over an estimated four to five day hospital stay. Physical examination led to diagnoses

---

[18]    A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. DSM–IV at 32.

of urinary tract infection, substance abuse, obesity, and depression. She tested positive for marijuana use.

Ms. Darby was given injections of Haldol and Ativan and started on Zoloft, Adderall, Trazodone, and Depakote. She received individual and group counseling as well as medication management. She improved slowly, with a decrease in her irritability, paranoia, suicidal and homicidal ideations, and psychosis. There was a decrease in the duration and frequency of her auditory hallucinations.

She was discharged to her stepmother's house with instructions to follow up with Psychiatric Nurse Practitioner Cynthia Labiche at Iberia Comprehensive Community Health. Her discharge medications were Adderall, Zoloft, Trazodone, and Depakote. The discharge diagnoses were Bipolar Disorder, Type I, ADHD, obesity, lack of primary support, social environment, and episodic drug abuse. Her GAF score at discharge was 45.[19]

On January 4, 2016, Ms. Darby saw psychiatric nurse practitioner Labiche in follow up after her hospitalization at Apollo.[20] She reported having been hospitalized due to anger and threats to harm herself and her family. She denied suicidal or homicidal ideation. Adderall was added to her medications. Her mood

---

[19] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM–IV at 32.

[20] Rec. Doc. 8-1 at 321-322.

was dysthymic and irritable. Seroquel and Prozac were discontinued for noncompliance; Zoloft, Depakote, and Trazodone were prescribed.

On March 28, 2016, Ms. Darby again saw nurse Labiche.[21]  She was noncompliant with prior prescription medications and focused on obtaining a prescription for Adderall.  She was calm when she arrived but after testing positive for THC, denying that she smoked marijuana, and being told that she would not be prescribed any stimulants, she refused new medications and left the office.

Ms. Darby was treated in the emergency room at Iberia Medical Center in April and May 2016 with medical problems unrelated to her mental health impairments.[22]

On May 24, 2016, Ms. Darby again went to the emergency room at Iberia Medical Center, this time with suicidal and homicidal ideation.[23]  She complained about mean family members and had formulated a plan for suicide by jumping into the bayou.  She gave a history of bipolar disorder and was described as hostile and noncommunicative.  She was also positive for amphetamines/methamphetamines. She was medically cleared for a psychiatric referral and transferred to Lafayette Behavioral Health Unit, but the record contains no treatment notes from that facility.

---

[21]     Rec. Doc. 8-1 at 317-318.

[22]     Rec. Doc. 8-1 at 291-300.

[23]     Rec. Doc. 8-1 at 301-306.

Two months later, on July 13, 2016, Ms. Darby was again seen at the Iberia Medical Center emergency room.[24]  She was having visual and auditory hallucinations and suicidal thoughts, her mood was depressed, and the physician's impression was major depression with suicidal ideation.  She was again cleared medically for a psychiatric referral to inpatient care.  However, there is no information in the record regarding any facility to which she might have been referred upon discharge from the emergency room.

On April 24, 2017, David N. Landry, Ph.D., a clinical psychologist, conducted a psychological evaluation of the claimant at the request of Disability Determination Services.[25]  Ms. Darby gave a history of ADHD, bipolar disorder, schizophrenia, depression, and a learning disability.  She reported that she had received both inpatient and outpatient psychiatric care.  She stated that she was unable to count money and therefore unable to find a job.  She denied ever having been employed.  She reported that she had been kicked out of her cousin's home and had slept in a vehicle the night before the examination.

Ms. Darby reported that she was raised by her godmother, who died when she was fifteen.  She then went to live with her biological mother, but was placed in a group home when she was sixteen.  She denied having had a relationship with her

---

[24]     Rec. Doc. 8-1 at 307-312.

[25]     Rec. Doc. 8-1 at 338-342.

deceased father.  She recalled physical and sexual abuse during childhood.  She had been living with her cousin until the day before.  She had never been married, and she had no children.

Ms. Darby reported that went to school up to the ninth grade, but had attention, learning, and behavior problems.  She claimed to have been placed in a GED program that she did not complete.  She reported having been arrested several times for fighting with family members.  She admitted that she had previously used marijuana but claimed that she no longer did so.  She denied alcohol abuse, but admitted alcohol abuse in her family.  She admitted smoking cigarettes.  She reported being diagnosed with borderline diabetes and having suffered a head injury after being struck with a baseball bat when she was younger.  Her mental health history included mood fluctuations, fighting, and behavior problems, ongoing symptoms of depression, and previous psychiatric hospitalizations.  She denied currently taking any medication.  Ms. Darby stated that she was able to dress herself and perform basic hygiene tasks as well as household chores.  She denied being able to count money and stated that she does not have a driver's license and is unable to drive.

Upon examination, she was oriented, exhibited a normal behavioral pace, had an emotionally labile mood and labile affect.  Her speech was normal, but her attention and concentration were slightly impaired.  Her memory was intact.  Her fund of knowledge and abstract reasoning were below average, her judgment was

fair to poor, and her thought content was intact, logical, organized, and coherent. No hallucinatory or delusional phenomena were observed or reported. She had no suicidal or homicidal ideation or plan. She had mild to moderate impairments in adaptive functioning, and borderline intellectual functioning. Dr. Landry opined that the results of his evaluation were reliable and valid, without exaggeration or malingering, although he found Ms. Darby's effort on the cognitive testing portion to be questionable at times.

On the WAIS-IV test, which measures general and specific cognitive ability, her full-scale standard score was 63, which is in the first percentile. However, Dr. Landry opined that she likely functioned closer to the borderline range of intelligence. She had borderline skills in verbal comprehension, working memory, and processing speed but her perceptual reasoning was below average.

Dr. Landry's diagnostic impressions were Bipolar I Disorder, recurrent, moderate; history of ADHD; history of cannabis abuse; and borderline intellectual functioning. He opined that although cognitive testing revealed that her intellectual capacity was below average, he estimated that she functioned closer to the borderline range of intelligence. He also opined that her adaptive functioning appeared moderately impaired by her intellectual functioning. He stated that she may have difficulty with complex and detailed instructions and her ability to sustain attention to simple, repetitive tasks for two-hour blocks of time may be intermittently

impaired by ongoing mood symptoms and behavioral impairments. He stated that her ability to get along with others in a work setting "will be most challenging." Furthermore, she may require assistance in managing her personal financial affairs. He recommended that she have consistent psychiatric treatment.

Within a few months, Ms. Darby was again hospitalized for psychiatric treatment. From August 23 to August 30, 2017, Ms. Darby was a patient at River Oaks Hospital outside New Orleans, Louisiana.[26] She was admitted on a PEC due to worsening depressive symptoms and suicidal ideation. She was planning to be run over by a train. At the time of admission, her dress and hygiene were adequate, but she was depressed and agitated, with guarded attitude and decreased eye contact. Her intelligence was described as below average, her judgment and insight were poor, and her activities of daily living were fair. She was diagnosed with depression, learning disabilities, obesity, and homelessness. Her strengths were her fair health and her ability to perform her activities of daily living. It was estimated that she would be hospitalized for five to seven days. She was admitted for treatment of a psychosis of unknown etiology. She was started on Celexa, Risperdal, and Cogentin. On August 28, she reported that the voices she heard were bad the night before, and it was noted that she was experiencing psychosis and mood lability. Her thought

---

[26]    Rec. Doc. 8-1 at 346-359.

processes were obsessive, somatic, and paranoid.  The next day, however, the voices were gone, and her thoughts were goal directed.  At the time of discharge, she denied suicidal or homicidal ideation as well as auditory or visual hallucinations, her prognosis was fair, her condition was stable, and she was discharged to Covenant House, a facility for homeless youth.  However, the record contains no treatment notes or other information from Covenant House.

On March 12, 2018, the claimant established care with Edmond X. Bergeron, III, a psychologist at Iberia Comprehensive Community Health Clinic in New Iberia, Louisiana.[27]  She reported that she suffered from schizophrenia, chronic depression, bipolar disorder, anxiety and post-traumatic stress disorder.  She was not taking any medication at that time but stated that she had received psychiatric treatment in the past, including having taken various psychoactive medications.  She described symptoms including crying spells, auditory and visual hallucinations, cognitive impairment, bouts of rage, lethargy, cutting behavior, emotional eating, nervousness, decreased concentration, and paranoia.  She stated that she planned to seek employment when she was more stable.  She denied suicidal and homicidal ideation. She reported hearing voices when no one was talking and seeing insects at the edge of her vision as well as having racing thoughts and thinking two thoughts at once.

---

[27]    Rec. Doc. 8-1 at 432-433.

She denied using drugs but reported recent legal problems due to fighting. Her clothing was appropriate, she was oriented to time, place, and person, and her attitude was cooperative; however, her mood was depressed, she was irritable, her affect was sad, she was agitated, a thought disorder was noted, and her thought content revealed impaired insight. The treatment notes indicate that she met the criteria for serious and persistent mental illness. She was prescribed Paxil, Remeron, Rexulti, and Topamax.

About two weeks later, Ms. Darby was admitted to Seaside Healthcare in Baton Rouge, Louisiana for psychiatric treatment. She was admitted on March 28, 2018 pursuant to a PEC from her primary care physician for threatening to harm herself and others. She was discharged on April 4, 2018.[28]

Prior to admission, Ms. Darby had threatened to harm her aunt and her aunt's daughter, was having auditory hallucinations in the form of a ticking noise, and had a plan to kill herself in a burning trailer. Alternatively, she had formulated a plan to kill herself by jumping into the bayou because she is unable to swim. Ms. Darby gave a history of having been raised by her grandmother who died when she was fifteen years old. She reported that her father died due to crack cocaine use and that her mother was still living but an alcoholic. She stated that she was currently living

---

[28]    Rec. Doc. 8-1 at 362-425.

with a female roommate in St. Martinville, Louisiana.  She also stated that she had been living in a "drug house" for about two months, after having lived on the streets for a while.  She reported having quit school in the ninth grade because she was in and out of different group homes.  She stated that she had never had a job, had never been married, and had no children.  She had been arrested for disturbing the peace and for simple battery in the past.  She claimed to have been physically, sexually, and emotionally abused by different people her whole life.  She had a history of cutting herself and had several superficial self-inflicted cuts to her left forearm.  She was diagnosed with bipolar disorder, posttraumatic stress disorder, cocaine and cannabis use disorder, and cluster B traits.[29]  She had been noncompliant with her medication.  She stated that she had been using marijuana daily for several years and had been using cocaine more recently.  She indicated that she wanted to go to rehab.  During the hospitalization, she indicated that she was feeling hopeless and had no family support.  Her acute problems upon admission were suicidal ideation, homicidal ideation, and substance abuse while her subacute problems were depression, family conflict, and grief issues.  Counseling services were provided, and the claimant was given Tegretol (mood stabilizer), Buspar (for anxiety),

---

[29]      "Cluster B personality disorders are characterized by dramatic, overly emotional or unpredictable thinking or behavior.  They include antisocial personality disorder, borderline personality disorder, histrionic personality disorder and narcissistic personality disorder."  Mayo Clinic,    http://www.mayoclinic.org/diseases-conditions/personality-disorders/symptoms-causes. com (last visited July 13, 2020).

15

Trazodone (for insomnia), and other medications to treat medical problems. At the time of discharge, Ms. Darby's mood had improved, she denied suicidal and homicidal ideation, her judgment and insight had improved, and she showed no signs of hallucinations, paranoia, or delusions. She was discharged to her friend's house and instructed to follow up at St. Martin Parish Health Center. However, the record contains no treatment notes from that health care provider.

On November 1, 2018, Ms. Darby testified at a hearing regarding her functional impairments and her medical treatment. She explained that she was then homeless with no health insurance and no driver's license. She said she had gone to the ninth grade in school. She stated that she had difficulty with reading and writing and had never had a job. She explained that, during her childhood, she had lived with a woman that her mother gave her to, that she was sexually abused by the son of the woman she lived with, starting at age four until age twelve or thirteen, and that she sometimes lived in foster care and in group homes. She lived part of 2017 with her aunt but had a disagreement with her aunt's daughter and was then homeless in the St. Martinville area, living in abandoned houses and eating meals provided by a church. She had stayed with her sister in New Iberia for a while, then was homeless again, sleeping outside. She explained that she sometimes slept outside a shelter for abused women and children under the shelter's surveillance camera.

Ms. Darby stated that she began receiving psychiatric care at about age twelve. She recalled having been hospitalized at Seaside earlier in the year and had been hospitalized again thereafter but could not remember the name of the facility.[30] She stated that she was not taking any medication because doctors did not want to deal with her. She stated that she eats more when she is depressed and weighed about 270 pounds at 5'4" tall. She stated that she was ashamed of her weight and felt that people were always talking about the way she looked. She stated that she obtained food from a church that gave out food on Thursdays. She did not want to talk about her mother, but testified that she had an aunt and cousin who might be willing to help her.

When asked about doing drugs, Ms. Darby admitted smoking cigarettes and admitted having smoked marijuana in the past, but she denied current drug or alcohol use. She stated that she did not like the effect that marijuana had on her and testified that she did not have money to buy drugs  She also testified that she told a hospital that she had used cocaine because she thought that would help her get into rehab and then a halfway house, and she would not have to go home.

The claimant now seeks reversal of the Commissioner's adverse ruling.

---

[30]    The record contains no evidence of inpatient treatment subsequent to Ms. Darby's hospitalization at Seaside.

17

## Analysis

A. **Standard of Review**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[31] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[32] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[33]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[34] In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[35] Conflicts in

---

[31]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[32]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[33]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[34]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[35]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

the evidence[36] and credibility assessments[37] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:   (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[38]

## B.    <u>Entitlement to Benefits</u>

The Supplemental Security Income ("SSI") program provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled.[39]  A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[40]  A claimant is disabled only if his physical or mental impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age,

---

[36]     *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[37]     *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[38]     *Wren v. Sullivan*, 925 F.2d at 126.

[39]     42 U.S.C. § 1382(a)(1) & (2).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1765, 1772 (2019).

[40]     42 U.S.C. § 1382c(a)(3)(A).

education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[41]

## C.    **Evaluation Process and Burden of Proof**

A sequential five-step inquiry is used to determine whether a claimant is disabled. This process requires the Commissioner to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[42] Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[43] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[44] The claimant's residual functional capacity is used at the fourth step to

---

[41]    42 U.S.C. § 1382c(a)(3)(B).

[42]    20 C.F.R. § 404.1520.

[43]    20 C.F.R. § 404.1520(a)(4).

[44]    20 C.F.R. § 404.1545(a)(1).

determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[45]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[46] This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[47] If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[48] If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[49]

---

[45]    20 C.F.R. § 404.1520(e).

[46]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[47]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[48]    *Perez v. Barnhart*, 415 F.3d at 461; *Fraga v. Bowen*, 810 F.2d at 1302.

[49]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

D.    **The ALJ's Findings and Conclusions**

he ALJ determined, at step one, that Ms. Darby has not engaged in substantial gainful activity since December 20, 2015, the alleged onset date.[50]  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  social anxiety disorder, obsessive compulsive disorder, dyslexia, bipolar disorder, obesity, attention deficit hyperactivity disorder, borderline intellectual functioning, polysubstance abuse, schizophrenia, and post-traumatic stress disorder.[51]  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[52]  The claimant did not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform medium work except for the following:  she is limited to performing simple, repetitive tasks; she can have no interaction with the public; she can have no more than occasional interaction with coworkers or supervisors; she is limited to work with no more than occasional changes in the work setting or routine; there can be no

---

[50]    Rec. Doc. 8-1 at 14.

[51]    Rec. Doc. 8-1 at 14.

[52]    Rec. Doc. 8-1 at 14.

fast-paced production quotas; she cannot climb ladders, ropes, or scaffolds; she must avoid unprotected heights and moving machinery; and she cannot drive as part of her work duties.[53]  The claimant challenged this finding.

At step four, the ALJ found that the claimant has no past relevant work.[54]  This finding is supported by substantive evidence in the record.

At step five, the ALJ found that Ms. Darby was not disabled from December 20, 2015 through November 23, 2018 because there are jobs in the national economy that she can perform.[55]  The claimant challenged this finding.

### E.    The Allegations of Error

Ms. Darby contends that the ALJ erred because (1) the ALJ's residual functional capacity finding was based on the ALJ's own unsupported opinion of the claimant's limitations; (2) there is no substantial evidence that the claimant has a sustained capacity for work; and (3) the ALJ failed to properly evaluate her obesity.

### F.    Did the ALJ Err in Evaluating the Claimant's Residual Functional Capacity?

A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all

---

[53]    Rec. Doc. 8-1 at 16.

[54]    Rec. Doc. 8-1 at 22.

[55]    Rec. Doc. 8-1 at 24.

relevant evidence in the claimant's record."[56]    The ALJ is responsible for determining a claimant's residual functional capacity.[57]  In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations.[58]  The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled.[59]  In making a residual functional capacity assessment, an ALJ must consider all symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  The ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not severe.[60]

In this case, the ALJ reviewed the evidence in the record and indicated the amount of weight she assigned to the various types of evidence.  She found the claimant's statements about the intensity, persistence, and limiting effects of her

---

[56]    *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).

[57]    *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

[58]    *Martinez v. Chater*, 64 F.3d at 176.

[59]    *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983).

[60]    *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

symptoms to be inconsistent. She gave little weight to the opinions of the claimant's stepmother because she is not a medical source and used vague terminology. She gave little weight to the opinions of Dr. Schexnayder at Magnolia Family Services because parts of his records are illegible and his opinions predated the current application for benefits. She gave partial weight to Dr. Landry, the examining psychologist, because he used vague terminology. She gave little weight to the state agency psychological consultant because additional records were obtained after he opined that he had insufficient information. She gave little weight to the GAF scores assigned by all of the doctors who examined the claimant. Having discounted the opinions of the physicians who treated the claimant, the consulting psychologist, the agency evaluator, the claimant's stepmother, and the claimant herself, it is unclear what the ALJ relied upon in finding that the claimant is capable of performing medium work (with some limitations) on a sustained basis. Accordingly, this Court finds that the ALJ's residual functional capacity finding is not supported by substantial evidence in the record.

A claimant seeking to overturn a decision of the Commissioner has the burden of showing that prejudice resulted from an error.[61] In other words, an ALJ's error is harmless only if it is "inconceivable that a different administrative conclusion would

---

[61]    *Graves v. Colvin*, 837 F.3d at 593; *Jones v. Astrue*, 691 F.3d 730, 734-35 (5th Cir. 2012)

have been reached absent the error."[62]  Here, the ALJ's error was not harmless since giving a different allocation of weight to the opinions of the physicians who examined Ms. Darby might have led to a conclusion that she lacks the residual functional capacity to do any work and, consequently, is disabled.  This matter should, therefore, be remanded for reconsideration of this issue.

## G.    Did the ALJ Properly Evaluate the Claimant's Ability to Sustain Employment?

Ms. Darby argued that the ALJ failed to properly evaluate her ability to sustain employment.  An ALJ is not required to make a specific finding regarding a claimant's ability to sustain employment in every case.[63]  When the claimant has an impairment that waxes and wanes, however, such a finding is necessary.[64]  To trigger specific findings regarding the sustainability of employment, a claimant must set forth evidence of two factors: 1) that her ability to sustain employment is compromised by her symptoms; and 2) her condition, by its very nature, waxes and wanes in its manifestation of disabling symptoms.

In this case, the medical evidence in the record establishes that Ms. Darby's mental health impairments, including bipolar disorder, depression and psychosis,

---

[62]    *Bornette v. Barnhart*, 466 F.Supp.2d 811, 816 (E.D. Tex., 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

[63]    *Perez v. Barnhart*, 415 F.3d at 465.

[64]    *Perez v. Barnhart*, 415 F.3d at 465.

wax and wane in severity over time, sometimes resulting in suicidal and homicidal ideation necessitating that she be hospitalized for inpatient psychiatric treatment. As courts in the circuit have recognized, a bipolar disorder, by its very nature fluctuates between manic and depressive states with periods of apparent stability.[65] While some courts have required more than a bipolar disorder diagnosis to determine that the impairment waxes and wanes in its manifestation of disabling symptoms,[66] that "something more" is readily apparent in this case. Treatment records document four separate hospitalizations between December 2015 and March 2018, a two-and-one-half year period of time, and the claimant testified regarding another more recent hospitalization that was not documented in the record. Her hospitalizations are intermittent periods of incapacity, reflecting that her mental health impairments wax and wane over time. Ms. Darby does not merely experience good days and bad days or up and downs, she has periods of time when her symptoms become so severe that she must be hospitalized for inpatient treatment. Therefore, even though she has never held a job, there is evidence in the record that she would from time to time have symptoms that prevent her from being able to sustain employment.

---

[65]     *Evans v. Commissioner of Social Security*, No. 4:18CV147-JMV, 2019 WL 4018345, at *2 (N.D. Miss. Aug. 26, 2019); *Cline v. Astrue*, 577 F.Supp.2d 835 (N.D. Tex. 2008) (citing American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders at 386 (Text Revision 4th ed. 2000)).

[66]     See, e.g., *Deihs v. Colvin*, No. A-14-CV-495-AWA, 2015 WL 1651443, at *6 (W.D. Tex. Apr. 13, 2015).

"[I]n cases of severe mental illness, the Fifth Circuit has specifically held that the Commissioner 'must determine whether the claimant can hold whatever job he finds for a significant period of time.'"[67]  Here, the ALJ found that Ms. Darby has a severe bipolar disorder.  Therefore, the ALJ erred in failing to evaluate her ability to sustain employment.  This was a failure to apply the correct legal standard, which necessitates remand.[68]  The ALJ's error was not harmless since a finding that the claimant's mental impairments wax and wane might have led to a conclusion that she was unable to sustain employment over time and, consequently, is disabled.  This matter should, therefore, be remanded for consideration of this issue.

## H.    **Did the ALJ Properly Evaluate the Claimant's Obesity?**

Social Security Ruling ("SSR") 02-1p recognizes that "[f]or adults, both men and women, the Clinical Guidelines describe. . . a [body mass index ('BMI')] of 30.0 or above as 'obesity.'"[69]  The ruling also expressly acknowledges that obesity can cause functional limitations in sitting, standing, walking, lifting, carrying, pushing, pulling, climbing, stooping, crouching, manipulating, as well as the ability to tolerate

---

[67]    *Cline v. Astrue*, 577 F. Supp. 2d at 849 (quoting *Leidler v. Sullivan*, 885 F.2d 291, 293 (5th Cir. 1989); citing *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)).

[68]    *Moore v. Sullivan*, 895 F.2d 1065, 1070 (5th Cir. 1990).

[69]    SSR 02-1p, Titles II and XVI: Evaluation of Obesity, 2002 WL 34686281, at *2 (Sept. 12, 2002).

extreme heat, humidity, or hazards.[70]  Thus, although obesity is not a listed impairment, it can reduce an individual's occupational base for work activity in combination with other ailments.[71]  Because it can have such a wide range of effects on a claimant, obesity must be considered at all steps of the sequential evaluation process.[72]

At step two, the ALJ found that Ms. Darby's obesity is a severe impairment. At step three, the ALJ stated that she considered Ms. Darby's obesity in evaluating whether her impairments met or medically equaled a listing.  In her evaluation of Ms. Darby's residual functional capacity, the ALJ twice mentioned that Ms. Darby's BMI was 50.5.  But merely mentioning a claimant's obesity is not the same as actually analyzing whether her obesity, when combined with other impairments, is disabling.  The ALJ found that Ms. Darby's obesity on its own is not disabling but did not analyze whether the combination of her obesity and her mental impairments is disabling.  Similarly, merely mentioning a claimant's obesity is not the same as analyzing whether her obesity has an effect on her residual functional capacity.  The

---

[70]     SSR 02-1p, 2002 WL 34686281, at *6.

[71]     See *Holt v. Saul*, No. 4:19-CV-01894, 2020 WL 2549346, at *3 (S.D. Tex. May 19, 2020); *McGee v. Astrue*, No. H-10-575, 2011 WL 11048325, at *3 (S.D. Tex. Feb. 25, 2011).

[72]     SSR 02-1p, 2002 WL 34686281, at *3.  See, also, e.g., *Holt v. Saul*, 2020 WL 2549346, at *3; *Perkins v. Berryhill*, No. 4:18-CV-664-A, 2019 WL 2997082, at *2 (N.D. Tex. June 21, 2019), report and recommendation adopted, 2019 WL 2996055 (N.D. Tex. July 9, 2019).

ALJ's ruling contains no such analysis and no findings regarding the impact of Ms. Darby's obesity on her residual functional capacity.

The record evidence shows that Ms. Darby's BMI was higher than 30 and thus clearly implicated SSR 02-1p.  At the hearing, Ms. Darby also explained that her BMI has a negative impact on her self-esteem.  This indicates that Ms. Darby's psychiatric problems may be exacerbated by her obesity.  Despite the medical evidence and Ms. Darby's testimony, the ALJ failed to properly analyze Ms. Darby's obesity at all steps of the sequential evaluation process.  The ALJ's failure to do so violated SSR 02-1p.

This Court finds that the ALJ's error in failing to properly address Ms. Darby's obesity was not a harmless error.  As noted above, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error.  In applying this standard, this Court has no trouble concluding that it is conceivable that the ALJ might have made a different decision if she had properly evaluated Ms. Darby's obesity.  While it is impossible to predict the precise ramifications of such an error, it is plausible that the ALJ's ultimate determination may have turned out differently if Ms. Darby's obesity had been properly analyzed.  Thus, this Court finds that the ALJ's error was not harmless.

Because the ALJ erred in failing to consider Ms. Darby's obesity in a manner consistent with SSR 02-1p and because the error was harmful, Ms. Darby's obesity should be reconsidered on remand.

## Conclusion and Recommendation

For the foregoing reasons, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions that the claimant's residual functional capacity should be reevaluated, a specific finding should be made with regard to whether the claimant can sustain employment, and a specific finding should be made with regard to whether the claimant's obesity when analyzed in combination with her other impairments is disabling. The claimant should be permitted to update the medical evidence and testify at another hearing.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within

fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[73]

      Signed in Lafayette, Louisiana, this 17th day of July 2020.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[73]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).